IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GIOVANI CARANDOLA, LTD., a North Carolina Corporation, and JANEL D. RALPH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| DOCKSIDE DOLLS, INC., a North Carolina Corporation, d/b/a/ Dockside Dolls; and NORTH CAROLINA GOLF AND TRAVEL, INC., a North Carolina Corporation, d/b/a Pure Gold of Southern Pines; and ELIZABETH GOFREDI, | ) ) ) ) ) ) ) | |
| New Party Plaintiffs | ) ) | |
| v. | ) ) | 1:01CV00115 |
| DOUGLAS A. FOX, in his official capacity as acting Chair of the North Carolina Alcohol Beverage Control Commission; MIKE A. JOYNER and RICKY WRIGHT, in their official capacities as Members of the North Carolina Alcohol Beverage Control Commission; BRYAN E. BEATTY, in his official capacity as Secretary of the North Carolina Department of Crime Control and Public Safety, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION

TILLEY, Chief Judge

This suit questions the North Carolina Legislature's amended statute

regulating conduct on premises licensed by the North Carolina Alcohol Beverage

Control Commission ("Commission" or "ABC"). Plaintiffs' Second Amended Complaint for Declaratory Judgment, Preliminary Injunction and Permanent Injunction [Doc. # 45] seeks both a declaration that North Carolina General Statutes §§ 18B-1005 and 18B-1005.1 are unconstitutional under the First and Fourteenth Amendments and an injunction to prevent the Commission from enforcing the statutes against Plaintiffs. Defendants responded by filing a Motion to Vacate Preliminary Injunction and Dismiss Claims for Mootness [Doc. # 43] seeking to dismiss all of Plaintiffs' claims related to § 18B-1005 and its accompanying regulation N.C. Admin. Code tit. 4, r. 2S.0216 (2000).

I.

Plaintiff Giovani Carandola, Ltd. ("Giovani") operates Christie's Cabaret ("Christie's"), a topless dancing establishment in Greensboro, North Carolina, which holds permits issued by the Commission to sell malt beverages, fortified wines, unfortified wine, and mixed beverages. Plaintiff Janel Ralph is employed as a dancer at Christie's. Her dance routines include theme shows, in which Ms. Ralph dances two to three songs in costume as an exotic character, and at least a portion of these performances involve Ms. Ralph dancing topless or touching her body. The current Defendants are the acting Chair of the North Carolina Alcohol Beverage Control Commission and other members of the Commission.

On November 11, 2000, entertainers at Christie's were allegedly witnessed by Commission officers engaging in acts in violation of N.C. Gen. Stat. § 18B-1005

2

(2000) and N.C. Admin. Code tit. 4, r. 2S.0216 (2000) ("the Rule"). In pertinent

part, § 18B-1005[1] provided:

> (a) Certain Conduct – It shall be unlawful for a permittee or his agent or employee to knowingly allow any of the following kinds of conduct to occur on his licensed premises:
>
> [Sections (1)(2)(3) omitted]
>
> (4) Any conduct or entertainment by any person whose private parts are exposed or who is wearing transparent clothing that reveals the private parts;
>
> (5) Any entertainment that includes or simulates sexual intercourse or any other sexual act; or
>
> (6) Any other lewd or obscene entertainment or conduct, as defined by the Rules of the Commission.

Pursuant to subsection (a)(6) of the statute, the Commission adopted the Rule

which provided:

> (a) No permittee or his employee shall allow any person to perform acts of or acts that simulate:
>
> (1) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts that are prohibited by law;
>
> (2) the touching, caressing or fondling of the breasts, buttocks, anus, vulva or genitals;
>
> (3) the display of the pubic hair, anus, vulva or genitals.
>
> (b) No permittee or his employee shall allow any person to use

---

[1] Although the statute has now been amended in response to this litigation, the following excerpt is how the statute read at the time the Commission charged Christie's with violating the statute.

3

artificial devices or inanimate objects to depict any of the prohibited
activities described in Paragraph (a) of this Rule.

(c) No permittee or his employee shall allow any person who
exposes to public view any portion of his pubic hair, vulva, genitals
or anus to remain in or upon the licensed premises.

In December 2000, Christie's received a Notice of Alleged Violation alleging that

Christie's violated the aforementioned statute and regulation. This notice was

accompanied with a Proposed Stipulation and Offer in Compromise, in which

Christie's would be allowed to stipulate to the violations and have its permits

suspended for 30 days. Christie's did not agree to the Stipulation and Offer in

Compromise. Instead, Christie's filed suit in this Court on January 29, 2001,

challenging the statute and regulation as violations of their First Amendment rights.

In April 2001, this Court preliminarily enjoined the enforcement of § 18B-1005 and

its accompanying regulation finding them unconstitutionally overbroad in violation

of the First and Fourteenth Amendments. Giovani Carandola, Ltd. v. Bason, 147 F.

Supp. 2d 383 (M.D.N.C. 2001). On August 30, 2002, the Fourth Circuit affirmed

in all material aspects. Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 512 (4th

Cir. 2002).

In 2003, the North Carolina General Assembly responded to the Fourth

Circuit decision by reenacting § 18B-1005 without subsections (a)(4), (a)(5), and

(a)(6). In addition, the General Assembly adopted N.C. Gen. Stat. § 18B-1005.1

which became effective August 1, 2003. The new statute states:

(a) It shall be unlawful for a permittee or his agent or employee to

4

knowingly allow or engage in any of the following kinds of conduct on his licensed premises:

(1) Any conduct or entertainment by any person whose genitals are exposed or who is wearing transparent clothing that reveals the genitals;

(2) Any conduct or entertainment that includes or simulates sexual intercourse, masturbation, sodomy, bestiality, oral copulation, or flagellation, or any act that includes or simulates the penetration, however slight, by any object into the genital or anal opening of a person's body; or

(3) Any conduct or entertainment that includes the fondling of the breasts, buttocks, anus, vulva, or genitals.

(b) Supervision.  It shall be unlawful for a permittee to fail to superintend in person or through a manager the business for which a permit is issued.

(c) Exception.  This section does not apply to persons operating theaters, concert halls, art centers, museums, or similar establishments that are primarily devoted to the arts or theatrical performances, when the performances that are presented are expressing matters of serious literary, artistic, scientific, or political value.

With the consent of the Defendants, a second amended complaint [Doc. # 45] was filed on October 10, 2003.  This complaint added two establishments and one dancer as new party plaintiffs[2] and retained all claims for declaratory injunctive relief as to the original statute and regulations, and also sought declaratory,

---

[2] Dockside Dolls, Inc. and North Carolina Golf and Travel, Inc. are corporations that operate adult cabarets in North Carolina.  Elizabeth Gofredi performs as a dancer.  Dockside Dolls, Inc. and Elizabeth Gofredi moved for dismissal pursuant to Federal Rule of Civil Procedure Rule 41(a) [Doc. # 64].  This Court granted their dismissal pursuant to its Memorandum Order filed October 1, 2004 [Doc. # 72].

5

preliminary, and permanent injunctive relief as to the newly enacted § 18B-1005.1. Defendants filed a Motion to Vacate Preliminary Injunction and Dismiss Claims for Mootness [Doc. # 43] seeking to vacate all of plaintiffs' claims related to § 18B-1005 and its accompanying regulation N.C. Admin. Code tit. 4, r. 2S.0216 (2000). Plaintiffs challenge the statutes and regulations as being overbroad and vague, both as applied and on its face. All parties to this action agree that there are no factual issues left to try before a jury.

II.

Article III of the Constitution limits the Court's power to hear only those cases involving an actual case or controversy. <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539, 546 (1976). A dispute must continue to exist at each successive stage of litigation because a federal court is not permitted to "render advisory opinions nor decide questions that cannot affect the rights of litigants in the case before them." <u>Preiser v. Newkirk</u>, 422 U.S. 395, 402 (1975). Furthermore, litigation challenging the validity of legislation ordinarily is rendered moot if during the pendency of the action the legislation is repealed or amended in a significant way so that the offensive provision ceases to exist. <u>U.S. Dep't of Treasury v. Galioto</u>, 477 U.S. 556, 559-60 (1986). However, litigation challenging a law is not moot if a party shows that the law could be reenacted after the case is dismissed. <u>City of Mesquite v. Aladdin's Castle, Inc.</u>, 455 U.S. 283, 289 (1982).

Plaintiffs argue that the original § 18B-1005 was not repealed but merely

6

amended in such a way that the offensive provision still exists.  Plaintiffs argue that they remain at risk of being charged with the violation of the original statute and its accompanying administrative Rule, and in the alternative, that the General Assembly's repeal of § 18B-1005 constitutes nothing more than a voluntary cessation and therefore falls within an exception to the mootness doctrine. Plaintiffs' argument fails to account for the unique facts of this case.  In this case § 18B-1005 and its accompanying administrative Rule were repealed.  There is no threat that they will be reenacted or that the General Assembly will pass a similar statute at some future date because the General Assembly has already passed a new, amended version of the old statute – N.C. Gen. Stat. § 18B-1005.1 (2003). There is no need to address the old statute when the newer version is also before the Court.  If the new statute survives the challenges against it, the General Assembly would have no reason to reenact the older statute.  Alternatively, if the new, narrower statute is overturned, the precedent of this case would prevent the General Assembly from reenacting the old statute.  Entering a declaratory judgment on the validity of the old statute would be an improper advisory opinion, and therefore counts I, II, III, and IV of Plaintiffs' Second Amended Complaint are dismissed as moot.

III.

Plaintiffs assert that § 18B-1005.1 is unconstitutional as applied to their erotic dancing businesses.  The First Amendment provides, "Congress shall make

7

no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  The First Amendment's Free Speech Clause has been held by the Supreme Court to apply to the states through the Fourteenth Amendment's Due Process Clause. Gitlow v. New York, 268 U.S. 652, 666 (1925).  The Free Speech Clause prevents the government "from dictating what we see or read or speak or hear."  Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245 (2002).  The Supreme Court has made clear that speech may not be restricted merely because it concerns matters that society may find offensive.  Id. at 245.  Sexual expression that is indecent but not obscene is protected by the First Amendment.  Reno v. ACLU, 521 U.S. 844, 874 (1997).

However, under the First Amendment "[e]xpressive conduct enjoys less protection than does pure speech and restrictions on its exercise are more likely to be constitutionally permissible."  Steakhouse, Inc. v. City of Raleigh, 166 F.3d 634, 637 (4th Cir. 1999).  Expressive conduct often receives less protection than pure speech because restrictions on expression are not typically aimed at the communicative aspect of the conduct, but on the noncommunicative aspects of the conduct.  Id.  State-imposed restrictions on expressive conduct often seek to dampen the noncommunicative, secondary effects of that conduct instead of the expression itself.  Id.

Nonetheless, the Supreme Court has held that "nude dancing . . . is expressive conduct within the outer perimeters of the First Amendment, though we

8

view it as only marginally so." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566 (1991) (plurality opinion). The Constitution protects more than "political and ideological speech but also live entertainment, including nude dancing and other performances involving nudity or other sexual elements." Giovani, 303 F.3d at 511. While the First Amendment prevents the total suppression of erotic materials, the Supreme Court has applied a lower standard in protecting erotic expression stating that "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . ." City of Erie v. Pap's A.M., 529 U.S. 277, 294 (2000) (plurality opinion) (citation omitted).

The Supreme Court's jurisprudence regarding the regulation of sexually oriented businesses has largely focused on two different types of regulations: adult entertainment zoning ordinances and public nudity ordinances. Both analytical frameworks are based on the doctrine of secondary effects, but each test uses a separate list of factors. Compare City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 46-50 (1986) (setting out the analytical framework for adult entertainment zoning ordinances: the court must determine (1) whether the ordinance constitutes an invalid total ban or merely a time, place, and manner regulation; (2) if the statute is determined to be a time, place, and manner regulation, whether the statute should be subject to strict or intermediate scrutiny; and (3) if the ordinance is held to be subject to intermediate scrutiny, whether it is

9

designed to serve a substantial government interest and allows for reasonable

alternative channels of communication), with Barnes, 501 U.S. at 567 (setting out

the analytical framework for evaluating content-neutral public nudity ordinances:

the court must determine whether (1) the government has the constitutional power

to enact the statute; (2) the statute furthers an important or substantial

government interest; (3) the governmental interest is unrelated to suppressing free

expression; and (4) the statute restricts First Amendment freedoms no greater than

necessary to further the government's interest) (citing United States v. O'Brien,

391 U.S. 367 (1968)). Despite the separate analytical frameworks, there is very

little difference in the application of the two tests. See Ward v. Rock Against

Racism, 491 U.S. 781, 798 (1989) (stating there is little, if any, difference

between the two tests); Ben's Bar, Inc. v. Vill. of Somerset, 316 F.3d 702, 714

(7th Cir. 2003) (noting that the Supreme Court's most recent cases make it

"abundantly clear that the analytical frameworks and standards utilized by the

Court in evaluating adult entertainment regulations, be they zoning ordinances or

public indecency statutes, are virtually indistinguishable"); but see Peek-a-Boo

Lounge of Brandenton v. Manatee County, 337 F.3d 1251, 1264 (11th Cir. 2003)

(concluding that the Renton and O'Brien tests are closely related, and "at times

overlapping" analytical frameworks, but that zoning and public nudity ordinances

"must be distinguished and evaluated separately"). Interestingly, both tests can be

traced back to the analytical framework enunciated by the Supreme Court in United

States v. O'Brien, 391 U.S. at 376, where the Court held that a statute prohibiting the destruction or mutilation of draft cards was a content-neutral regulation of expressive conduct. Young v. American Mini Theatres, Inc., 427 U.S. 50, 79 (Powell, J., concurring) (applying O'Brien test); Barnes, 501 U.S. at 582 (Souter, J., concurring) (same). While the Court continues to analyze public nudity statutes with the four O'Brien factors, the Court currently evaluates adult entertainment zoning ordinances as time, place, and manner regulations and uses the three factors enunciated in Renton.

This case does not involve a zoning ordinance nor a public nudity ordinance; instead at issue is the constitutionality of portions of an adult entertainment, liquor regulation which do not relate to nudity. The Supreme Court has upheld adult entertainment liquor regulations in the past but their decisions have not created an analytical framework. In California v. LaRue, 409 U.S. 109 (1972), the Supreme Court upheld an ordinance that prohibited nude dancing where liquor was sold finding that "the conclusion embodied in [the statute], that certain sexual performances and the dispensing of liquor by the drink ought not to occur at premises that have licenses was not an irrational one." Id. at 118. In LaRue, the Supreme Court relied in part upon the idea that the Twenty-first Amendment lends an added presumption in favor of the validity of a regulation of otherwise protected speech when it occurs at the site of the sale of alcoholic beverages. Id. at 118-19. Recently, the Supreme Court overruled the portion of LaRue that relied upon the

11

Twenty-first Amendment; however, the Court upheld the precedential value of

LaRue's holding stating that "entirely apart from the Twenty-first Amendment, the

State has ample power to prohibit the sale of alcoholic beverages in inappropriate

locations." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 515 (1996) (citing

to Barnes in upholding LaRue's precedential value). Nonetheless, Circuit Courts of

Appeals have struggled in deciding whether adult entertainment liquor regulations

should fall under the analytical framework of zoning regulations or public indecency

regulations. See e.g., Ben's Bar, Inc., 316 F.3d at 722 (combining the Renton and

O'Brien tests to create a new four factor test); Sammy's of Mobile, Ltd. v. City of

Mobile, 140 F.3d 993, 996-99 (11th Cir. 1998) (analyzing under both the O'Brien

test and the Renton test). Because the two analytical frameworks were both

derived from the O'Brien test and are nearly indistinguishable, and because the

Supreme Court expressly cited Barnes, which applied the O'Brien test, in upholding

the precedential value of LaRue, the four factor O'Brien framework will be used to

analyze the constitutionality of § 18B-1005.1.

The Plaintiffs' argument that the O'Brien test should not apply because

North Carolina's statute is content-based has already been settled. The Fourth

Circuit previously held that the predecessor to § 18B-1005.1, N.C. Gen. Stat. §

18B-1005, was content-neutral and only subject to intermediate scrutiny.

Giovanni, 303 F.3d at 515. The statute has not changed sufficiently to alter the

12

controlling Fourth Circuit precedent that this statute should be reviewed under an intermediate level of review. However, intermediate scrutiny is not a toothless standard, and the government bears the burden of persuasion. Id.

## A.

The first prong of O'Brien requires the State to have the constitutional power to enact the statute in question. See Barnes, 501 U.S. at 567. Regulating sexually explicit conduct that occurs where alcohol is dispensed is clearly within North Carolina's general police powers. 44 Liquormart, 517 U.S. at 515 ("Entirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations"). Thus, the statute is clearly within the constitutional power of North Carolina.

## B.

The second O'Brien prong requires the Defendants to show that the State has a substantial interest in preventing secondary effects associated with sexually explicit conduct occurring on premises that are licensed by the Commission. See Barnes, 501 U.S. at 567. The Supreme Court recently provided guidance in analyzing this factor in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002) ("We granted certiorari to clarify the standard for determining whether an ordinance serves a substantial government interest under Renton.") (citation omitted). Although the Court was clarifying the third prong of Renton, the logic is

13

equally applicable to the second prong of <u>O'Brien</u> because both tests use the same language. <u>See</u> <u>supra</u> (discussing the similarities between the <u>Renton</u> and <u>O'Brien</u> tests).

Although no majority opinion arose from <u>Alameda Books</u>, Justice Kennedy's opinion concurring in the judgment is the narrowest opinion joining the judgment, and therefore is the controlling opinion. <u>See</u> <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'") (omitting citation). Justice Kennedy wrote separately because he feared the plurality opinion "might constitute a subtle expansion, with which I do not concur." <u>Alameda Books</u>, 535 U.S. at 445 (Kennedy, J., concurring). Justice Kennedy stated that two questions must be asked by a court seeking to determine whether a zoning ordinance regulating adult entertainment is designed to meet a substantial government interest: (1) what proposition must a state advance in order to maintain a secondary effects statute? and (2) how much evidence is required to support the proposition? <u>Id.</u> at 449. Justice Kennedy thought that the plurality skipped the first question and only explained the amount of evidence necessary to justify a secondary effects rationale.

14

1.

Before a court reaches the evidence question, a state must "advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." Id. An important part of the inquiry that a court must address is how speech will fare under the new statute. Id. The ordinance in question in Alameda Books was a zoning ordinance that prohibited multiple adult entertainment businesses from locating within the same building. Id. at 429. Justice Kennedy applied his analysis to the challenged ordinance stating that if two adult businesses are under the same roof, the challenged ordinance will either require one business to move elsewhere or to close. The city's premise cannot be the latter, but must be that such businesses will for the most part disperse rather than shut down, so that the quantity of speech will be substantially undiminished.[3] Id. at 451. To decide that N.C. Gen. Stat. § 18B-1005.1 furthers a substantial government interest, according to the road map provided in Alameda Books, the first question this Court must consider is whether the General Assembly passed § 18B-1005.1 with "the purpose and effect of suppressing secondary effects, while

_____

[3]The Fourth Circuit followed similar logic in Hart Book Stores, Inc. v. Edmisten, 612 F.2d 821, 827 (4th Cir. 1979), finding that the First Amendment is not offended so long as a zoning ordinance would not prevent public access to adult materials and the overall availability of the materials would not be greatly affected.

15

leaving the quantity and accessibility of speech substantially intact." <u>Alameda Books</u>, 535 U.S. at 449 (Kennedy, J. concurring).

The preamble to the statute specifically denies the intent "to suppress the conduct of entertainment" and affirms that its intent is "to address the harmful secondary effects of such entertainment, including higher crime rates, public sexual conduct, sexual assault, prostitution, and other secondary effects." 2003 N.C. Sess. Laws 382. The legislature's stated purpose is in accord with <u>Alameda Books</u> and the plaintiffs did not allege that the statute would affect the quantity and accessibility of speech.

2.

Only after ascertaining that the state's rationale is reducing secondary effects should a court reach the <u>Alameda Books</u> plurality's analysis regarding how much evidence the state needs to justify its proposition. The evidentiary bar for a state that passes a statute addressing the secondary effects of protected speech is not high. A state may rely on any evidence that is "reasonably believed to be relevant" to demonstrate a connection between the speech and the secondary effects. <u>Id.</u> at 438. However, the state may not rely on "shoddy data or reasoning" and its "evidence must <u>fairly support</u> [its] rationale." <u>Id.</u> (emphasis added). Plaintiffs have the opportunity at trial to cast doubt on the state's rationale by "demonstrating that the [state's] evidence does not support its

16

rationale or by furnishing evidence that disputes the [state's] factual findings." Id.
at 438-39. If a plaintiff fails to cast doubt on the government's rationale, the
inquiry is over and the government meets its burden of proof. If plaintiffs succeed
in casting doubt on the state's rationale, the burden shifts back to the state to
supplement the record with evidence renewing support for a theory that justifies its
ordinance.[4] Id. at 439. This deference to the state's evidence is the result of a
careful balance between competing interests: courts have an obligation to use
independent judgment when First Amendment rights are at issue, but courts also
must acknowledge that state and local governments are in a better position than
the judiciary to gather and evaluate data on local problems. Id. at 440. In
balancing these competing interests, the plurality rejected raising the evidentiary
bar to require a government to verify that the ordinance actually will reduce
secondary effects. Id. at 441. Instead, the government must reasonably believe
the evidence it relied on is relevant to the reduction of secondary effects, and the
evidence must "fairly support" this proposition. Id.

Governments are free to rely on many different types of evidence to show
that they reasonably believed their statutes are relevant to reducing secondary

_____

[4]Only if the evidence the legislature considered pre-enactment is rebutted by
the plaintiffs can the state supplement the record with post-enactment evidence to
prove its theory that the legislation will reduce secondary effects. Center for Fair
Public Policy v. Maricopa County, 336 F.3d 1153, 1166 n.3 (9th Cir. 2003).

17

effects. The government does not have to "conduct new studies or produce evidence independent of that already generated by other [entities] to demonstrate the problem of secondary effects." Pap's A.M., 529 U.S. at 283. Further, a governmental entity may rely on court precedents involving the same character of adult entertainment that it is regulating. Id. A governmental entity may also consider anecdotal evidence as well as their own common sense and wisdom to fairly support their reasonable belief that the legislation will reduce secondary effects. Sammy's of Mobile, 140 F.3d at 997.

Next, the Defendants must show that the North Carolina General Assembly relied on evidence that "fairly supports" its reasonable belief that the statute will reduce the negative secondary effects of adult entertainment.[5] The preamble to N.C. Gen. Stat. § 18B-1005.1 states that the General Assembly relied on the Fourth Circuit's ruling stating "that entertainment such as nude or topless dancing at bars and clubs has 'a long history of spawning deleterious effects,' including

---

[5]The amount of evidence necessary to "fairly support" the government's rationale has not been defined by the Supreme Court. Because reviewing factual findings of a state legislature places a court in a similar position that it faces when reviewing factual findings of administrative agencies, the substantial evidence rule from administrative law is adopted in this opinion to quantify the amount of evidence necessary to fairly support the General Assembly's rationale. Substantial evidence is evidence "affording a substantial basis of fact from which the fact in issue can be reasonably inferred. . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299-300 (1939).

'prostitution and the criminal abuse and exploitation of young women.'" 2003 N.C. Sess. Laws 382. In the Preamble, the General Assembly also states that it has "reviewed studies of the secondary effects of sexually oriented businesses that have been conducted in locations across the United States, including: Phoenix, Arizona; Los Angeles, California; Minneapolis, Minnesota; Austin, Texas; New York City, New York; Oklahoma City, Oklahoma; and other cities." Id. At trial H. Allen Pell, staff attorney for the North Carolina General Assembly and committee counsel for the Senate Judiciary Committee, testified by deposition that he provided the members of the General Assembly with "Summaries of Key Reports Concerning the Negative Secondary Effects of Sexually Oriented Businesses" as compiled by Louis F. Comus, III ("Comus Summaries"). The Comus Summaries are short, one page summaries of the studies that the General Assembly referenced in the Preamble.

All of the evidence the North Carolina General Assembly considered would afford a substantial basis of fact that would allow the General Assembly to reasonably infer that regulating adult entertainment upon ABC-licensed premises will reduce secondary effects. A comparison of the record before the North Carolina General Assembly to the record amassed in prior cases shows that the quantum and quality of evidence here compares favorably to the evidence considered in several other cases. See, e.g., Center for Fair Public Policy v. Maricopa County, 336 F.3d 1153, 1166-68 (9th Cir. 2003) (stating that although

19

the "pre-enactment record is a slim one" consisting of letters documenting problems associated with sexually oriented businesses and a "fact sheet" citing fourteen studies from other locales that found secondary effects associated with adult entertainment, the record was sufficient); <u>Ben's Bar</u>, 316 F.3d at 725 (finding that relying upon judicial decisions and studies from thirteen other cities was sufficient); <u>Sammy's of Mobile</u>, 140 F.3d at 997 (finding a "reasonable basis" for believing the ordinance serves a substantial governmental interest after considering the experience of other cities, studies in other cities, and caselaw reciting findings on the issue). Although the pre-enactment evidence in this case is not overwhelming, it does not have to be. <u>See</u> <u>Alameda Books</u>, 535 U.S. at 451(Kennedy, J. concurring) (stating that "very little evidence is required" to justify a secondary effects ordinance). Therefore, the evidence before the General Assembly fairly supports its rationale for enacting the statute.

However, under <u>Alameda Books</u>, the Plaintiffs have the opportunity to "cast direct doubt on [the state's] rationale" either by showing that the state's evidence was "shoddy" or by providing its own evidence that disputes the state's factual findings. <u>Id.</u> at 441 (plurality opinion). The Plaintiffs called two experts to cast doubt on the state's rationale: Dr. Daniel Linz and Mr. R. Bruce McLaughlin. Dr. Linz is a professor at the University of California Santa Barbara with appointments in the department of communication and the law and society program. Dr. Linz teaches courses in statistics and methodology as well as courses on the application

20

of social sciences to the First Amendment. He has published articles, including several in peer-reviewed journals, analyzing the theory that adult oriented businesses create secondary effects. Dr. Linz testified about the bias and selective reporting of the Comus Summaries, about the methodological problems of the studies included in the Comus Summaries, and about three of his own studies that showed no secondary effects associated with adult-oriented businesses.

First, Dr. Linz testified about the bias and selective reporting of the Comus Summaries. Dr. Linz testified that the Comus Summaries appear on a website developed by the National Law Center for Children and Families ("NLC") whose mission is to protect children and families from the harmful effect of illegal pornography by assisting in the "improvement" of the law. The NLC provides these "canned" summaries to governments across the United States to foster more regulation of sexually oriented businesses. Dr. Linz also testified that he has submitted his studies that find no relationship between secondary effects and the location of sexually oriented businesses to the NLC; however, his studies are not included in the Comus Summaries nor are they accessible on the website. In addition, Dr. Linz examined each study included in the Comus Summaries and found that twelve of the summaries inaccurately reported the study author's actual findings.[6]

_____

[6]In his testimony, Dr. Linz went through each study included in the Comus Summaries individually. This opinion looks in detail at the bias and selective reporting only in the summaries of the studies specifically cited by the General

21

Dr. Linz also criticized the methodology used by the studies that the North Carolina General Assembly cited.  Dr. Linz analyzed the methods of each study using five questions that he has created using colloquial language, but that reflect sound principles of social science research methods: (1) "Compared to what?" asks if the study has a suitable comparison or control that takes into account other variables that may account for changes in crime or property values; (2) "Is this a one-time fluke?" asks if the study has a sufficient time period of data to find a trend; (3) "Is the crime information or property value information measured by a reliable source?" asks if the study has a viable measuring unit; (4) "Did the police go looking for more crime?" again asks if the study's measurement source is reliable or whether the results are based upon stepped up police enforcement in the area; and (5) "Did the government talk only to people who would give the answers they wanted to hear?" tests the validity of surveys or polls conducted by the government.  Dr. Linz based these five questions on the same criteria he previously used to evaluate the top ten studies generally relied upon by communities regulating adult-oriented businesses in a peer-reviewed article that he coauthored. See Bryant Paul, Daniel Linz, & Bradley J. Shafer, Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects, 6 Comm. L. & Pol'y 355, 367 (2001).

Using these five questions, Dr. Linz concluded that with few exceptions the

Assembly in the Preamble.  See infra.

methods used in the studies included in the Comus Summaries are seriously flawed and sometimes fatally flawed. Further, he found that the few studies that are scientifically credible showed either no negative secondary effects associated with adult entertainment or a reversal of the presumed negative effect. Dr. Linz discussed each study individually and identified either the study's methodological shortcomings or pertinent information that Mr. Comus failed to include in the summary. He criticized the methodology of ten of the studies included in the Comus Summaries and concluded that the results in those studies should not be relied upon.[7] Dr. Linz also noted that many of the summaries are not even statistical studies, but merely reports of opinions of other legislators discussing the various methods of zoning or regulating adult-oriented businesses. Often the reasoning of these reports is based on the same allegedly flawed studies that are summarized elsewhere in the Comus Summaries and harshly criticized by Dr. Linz. Ten of the twenty-six "studies" included in the Comus Summaries are actually reports that either offer anecdotal information specific to the city or rehash other studies and explain the regulatory route that government chose to pursue.

The Phoenix, Arizona, study attempted to examine the relationship between adult entertainment businesses and local crime rates. Paul, Linz & Shafer, supra at 379-80. The Comus Summary states that the "results show a marked increase in

---

[7] This opinion discusses in detail only the problems in the methodologies used in the studies specifically referred to by the North Carolina General Assembly in the preamble to N.C. Gen. Stat. § 18B-1005.1. See infra.

sex offenses in neighborhoods with sexually oriented businesses, and increases in property and violent crimes as well." However, Dr. Linz found the evidence of negative secondary effects contained in this study "equivocal at best." Id. at 380. He first faulted the study for unacceptable variance between the control areas and the study areas. For example, the median income for Study Area One was 30% lower than its matching control, and Study Area One had substantially fewer buildings built since 1950 than its corresponding control area. Id. According to Dr. Linz, because income and crime levels are generally inversely related, part of the higher crime rates attributed to the adult-oriented businesses in the study areas is likely attributable to the lower income levels in the study areas. The Comus Summary states that the study areas were paired with control areas according to median income and percentage of dwelling units built since 1950, but it does not mention the large disparities in the actual pairing or that the disparity would favor a finding that the adult oriented businesses cause secondary effects. Dr. Linz also found that the data was collected over an insufficient period of time, so that the study may be reflecting only an erratic pattern of social activity. Finally, Dr. Linz noted that although the overall crime rates were higher in each of the study areas than those for each matching control area, a composite index of "violent crimes" was also constructed by the study author and each study area yielded a lower rate of violent crime than the matched control area. In addition, the rate of child molestation was higher in the control areas than in the study areas. Not only does

24

the Comus Summary of the Phoenix report omit this information, but the summary actually claims a marked increase in violent crimes in neighborhoods with sexually oriented businesses. Therefore, Dr. Linz criticized both the methodology of the Phoenix study and the Comus Summary's representation of the Phoenix study.

The Los Angeles, California, study consisted of four parts and looked at the effects an adult oriented business has on both property values and crime rates. In the first part of the study, the researchers state that they found no evidence of a relationship between adult businesses and lower property values. Id. at 377-78. In fact in several areas, property values increased much more quickly in the study areas than in the control areas. The Comus Summary reports this portion of the study by ambiguously stating that the data "did not conclusively show" a relationship between adult businesses and property values. In the second part of the study, a survey was used to gauge public opinion about the operation of an adult business. Dr. Linz pointed out that the survey failed to adhere to minimum professional standards because the researchers failed to obtain a random sample of respondents; thus, the reliability of the results cannot be determined. Id. at 378. The Comus Summary does not disclose a response rate nor any methods used to conduct a study, but only reports the results. In the third part of the study, the researchers acknowledged that they could find no significant differences in crime rates between the study areas and the control areas. Id. at 379. However, the Comus Summary reports that "[m]ore crime occurred where sexually oriented

25

businesses were concentrated" without mention of the researchers'
acknowledgment that the differences were insignificant. Finally, the fourth part of
the study involved a special police study of areas of Hollywood containing clusters
of adult entertainment businesses. The researchers admitted to a substantial
change in police surveillance of the area under study, which Dr. Linz claimed
rendered all results "at least suspect and most likely meaningless." Id. The Comus
Summary makes no mention of this acknowledgment by the researchers. Thus,
Dr. Linz questioned the methods used in the Los Angeles study as well as the
accuracy of the summarization by Comus.

The Minneapolis, Minnesota, study looked at the effects of adult businesses
on property values and crime rates. The Comus Summary states that the report
"concluded that concentrations of sexually oriented businesses have [a] significant
relationship to higher crime and lower property values." However, Dr. Linz said
that the study authors' theory that concentrations of adult businesses have a direct
effect on property values was not borne out by the path analysis in the study.
Further, Dr. Linz claimed the study indicated only a weak direct link between crime
and concentrations of adult businesses. He said that when the study accounted
for other control variables such as demographic characteristics in the path analysis,
the presence of adult businesses became unimportant in determining the crime
rate. Therefore, Dr. Linz believed the summary inaccurately reported the study's
actual findings.

26

The Austin, Texas, study examined the relationship between sexually oriented businesses and crime in four study areas. Two study areas had one adult business and the others had two such businesses. The study revealed that these areas had significantly more crime than their corresponding control areas. However, Dr. Linz questioned why the authors of the study chose to consider only these six sexually oriented businesses when the city has forty-nine such businesses. He testified that the researchers' explanations for eliminating the other forty-three are inadequate and questioned if the selection was the result of searching for the most significant impacts. Even if their reasons for removing forty-three of the adult businesses were legitimate, Dr. Linz claimed that eliminating over eighty percent of the potential study areas casts doubts over the validity of the study's findings. Thus, Dr. Linz questioned the methodology used in this study.

The New York City, New York, study also analyzed the effects sexually oriented businesses have on property values and crime rates. In this case, the Comus Summary admits that the crime statistics in New York City did not show higher crime rates in the study areas. However, Dr Linz criticized the summary for failing to include that the authors found land use indicators other than the presence of adult businesses, such as subway station access, to have a far more significant impact on the presence of crime. The Comus Summary also reports that property values in proximity to sexually oriented businesses appreciated at a slower rate

27

than in other areas of the city. However, Dr. Linz pointed out that the Comus Summary fails to include that the authors explicitly stated that they did not have enough data to prove any possible relationship between the location of sexually oriented businesses and property values. Thus, Dr. Linz concluded that the Comus Summary did not provide an accurate portrayal of the New York City study's actual findings.

Finally, the Oklahoma City, Oklahoma, study is actually a survey of one hundred real estate appraisers in the city. The appraisers were asked to respond to a hypothetical situation involving an adult bookstore that moved into a commercial area a residential neighborhood. The Comus Summary states that the respondents "overwhelmingly" said that an adult bookstore would negatively affect other businesses within one block and that such a bookstore would also decrease home values within one block. Dr. Linz said these results have no credibility because the survey was not conducted according to standard scientific methods. First, only 34% of the appraisers surveyed actually responded – "an exceptionally low response rate." Dr. Linz further explained that when there is a very low response rate the burden is on the researcher to make sure that the small number responding does not make up a biased segment of the surveyed community. Because the surveyors made no effort to determine if the respondents were a biased segment of the overall real estate appraiser community, Dr. Linz opined that the results of this study cannot be relied upon. Thus, Dr. Linz criticized the reliability of the methods

28

employed in the Oklahoma City study.

In addition to offering evidence that the General Assembly relied on "shoddy data," the Plaintiffs also furnished evidence disputing that sexually oriented businesses are correlated to increases in crime. Dr. Linz testified about three studies which he has conducted. He concluded that his studies were more methodologically sound than the studies relied upon by the General Assembly. In those studies he found no correlation between increased crime rates and the location of sexually oriented businesses. First, Dr. Linz referred to a study conducted in Fort Wayne, Indiana, examining the possible secondary effects on crime from adult cabarets.[8] This study looked at incidents of crime within one thousand feet of the eight cabarets located in Fort Wayne and compared that data with a matched control area that accounted for the demographic characteristics of the study area. Although the differences were not statistically significant, the study often revealed higher incidents of crime in the control areas than in the study areas containing adult cabarets. Thus, the Fort Wayne study concluded that there were no adverse secondary effects of crime associated with adult cabarets in Fort Wayne.

Second, Dr. Linz testified about a similar study conducted in Charlotte, North Carolina, that looked at twenty adult cabarets and their possible secondary effects

---

[8]The paper reporting the results of the Fort Wayne study won top paper at the International Communication Association annual meeting. The United States Justice Department also recognized the work as top paper in crime mapping.

on crime in both one thousand and five-hundred foot areas surrounding the clubs.[9]
Instead of matching each club with a control area, in this study the clubs were
grouped into three study areas and each of those groupings was matched with a
demographically similar control area.  The study then compared the crime events
over a three year period between each study area and its corresponding control
area.  The Charlotte study found that the presence of an adult nightclub does not
increase the number of reported crime incidents and the results actually imply the
opposite: that less crime occurs around the adult cabarets than in the control
areas.  Dr. Linz postulated that this reversal of the presumed effect could arise
because of the security and safety precautions provided by the club owners in the
areas immediately surrounding the cabarets.  In addition, the Charlotte study also
looked at the rate of appreciation in residential property surrounding adult
businesses compared to residential property not around adult businesses over the
twenty year period from 1980-1999.  Although the data from the 1980s consisted
of wide variances in property valuations that revealed no consistent patterns, in the
1990s residential property appreciated steadily regardless of its proximity to adult
businesses, but the appreciation of property close to adult businesses was slightly
larger than for property that was not in proximity to adult businesses.  Therefore,

_____

[9] This study was published in the Law and Society Review.  Daniel Linz et.
al., <u>An Examination of the Assumption that Adult Businesses Are Associated with
Crime in Surrounding Areas: A Secondary Effects Study in Charlotte, North
Carolina</u>, 38 Law & Soc'y Rev. 69 (2004).

the study concludes that there was no evidence supporting a theory that adult businesses decrease the value of surrounding residential property.

Third, Dr. Linz testified about a study conducted in Greensboro, North Carolina, that examined all the adult cabarets in the city. In this study, instead of finding matching control groups, Dr. Linz used regression analysis to account for all of the demographic variables that explain crime in Greensboro. Dr. Linz then inserted another variable into the equation to account for the presence or lack of a presence of an adult cabaret to determine if the presence of a cabaret accounted for any additional variance in the crime rates. The study concluded that essentially zero variability in crime is explained by the presence of an adult cabaret in a neighborhood. Dr. Linz also testified that he conducted a before and after study based on the opening of one cabaret and the closing of another cabaret during the study time period. To do these two studies Dr. Linz again matched control areas to each cabaret to account for demographic characteristics. When the adult cabaret opened, the study revealed no significant change in crime in the area. When another adult cabaret closed, the data showed an increase in crime after the cabaret closed. Therefore, this before and after study again failed to show any support for the theory that adult cabarets produce secondary effects such as increased crime rates in the surrounding area.

In addition to Dr. Linz's testimony -- dealing primarily with crime rates -- the Plaintiffs called a local government consultant and expert on land use planning, R.

31

Bruce McLaughlin, to testify about the effects sexually oriented businesses may have on property values and urban blight. Mr. McLaughlin conducted a study of nineteen sexually oriented businesses in Greensboro, North Carolina, in accordance with peer-reviewed methodologies, to determine if they produce the adverse secondary effects of lower property values, urban blight, and urban instability. The nineteen businesses were grouped into fifteen study areas and matched with a similar control area for purposes of comparison that accounted for demographic indicators as well as traffic and road access to the area. Mr. McLaughlin stated that any bias that could not be avoided in the matching process was always to the detriment of the sexually oriented businesses. Based on his study, Mr. McLaughlin concluded that sexually oriented businesses have not caused urban blight nor have they caused property values to decline in their immediate areas. Mr. McLaughlin's unrebutted testimony found no adverse secondary effects either to property values or to urban stability resulting from sexually oriented businesses.

Mr. McLaughlin's testimony about his Greensboro, North Carolina study and Dr. Linz' evidence about his studies in Charlotte and Greensboro, North Carolina have added significance since the state did not have any localized data to support its findings. While the Defendants are able to rely on studies conducted by other governments, see Artistic Entm't, Inc. v. City of Warner Robins, 223 F.3d 1306,1309 (11th Cir. 2000), evidence that localized studies showed opposite findings gains additional credence when the reliability of out of state studies is

32

questioned.

Therefore, considering the evidence presented, the Plaintiffs carried their initial Alameda Books burden by casting direct doubt on the state's evidence of secondary effects.

When a Plaintiff has succeeded in casting doubt upon the government's rationale, the Defendants have the opportunity to "supplement the record with evidence renewing support for a theory that justifies the ordinance." Alameda Books, 535 U.S. at 441. The Defendants supplemented the record at trial with the testimony of Dr. Richard McCleary, professor at the University of California-Irvine. Dr. McCleary is appointed in three departments: Environmental Health Sciences, Criminology, and Planning. Dr. McCleary also has worked as a consultant for governments conducting statistical studies of crime-related secondary effects arising from sexually oriented businesses.

First, Dr. McCleary's testimony tended to rehabilitate the evidence relied upon by the General Assembly. Dr. McCleary stated that although the Comus Summaries do not include every finding of the researchers, they are very useful and for the most part accurately reflect the findings of the included studies. He observed that any time you take a study of 120 pages or more and reduce it to 120 words judgment calls are involved but that, overall, the Comus summaries are useful. Dr. McCleary disagreed with Dr. Linz's statements that the summaries often did not include explicit repudiations of the study's findings by their authors.

33

Dr. McCleary testified that by adding the qualifiers Dr. Linz cited, the authors were not repudiating their findings but merely qualifying them which he testified is a common rhetorical tool used by social scientists. Dr. McCleary stated that good social science researchers are always very conservative in their findings and that qualifying statements to limit their findings are not the same as repudiating the validity of the entire study. Thus, Dr. McCleary testified that the Comus Summaries are not biased or inaccurate merely because they do not fully disclose every qualifying statement of each study. Creating an abstract of a lengthy study simply does not allow the writer to include every detail of the study, and omitting qualifications of a study does not make the Summaries any less useful to a legislature. Dr. McCleary's testimony regarding the Comus Summaries did not address all the specific discrepancies which Dr. Linz pointed out, instead Dr. McCleary merely gave his opinion on the usefulness of the Comus Summaries as a whole.

Dr. McCleary also acknowledged that as Dr. Linz pointed out some of the summarized studies are not empirical studies, meaning that they are not statistical analyses. However, Dr. McCleary reasoned that the reports remain relevant and useful for a legislature to consider in passing a law regulating sexually oriented businesses. He testified that the reports are more than just summaries of the other studies; the reports explain the local conditions and apply the findings of the older studies to the local conditions. Dr. McCleary testified that scientific journals

34

publish reviews of studies all the time which are useful to voice different viewpoints on studies that have already been performed. Because of the expense involved in conducting these studies, not every government body will have the money to conduct their own study but it remains useful to review the viewpoints of different legislative bodies and how each believed the studies related to their city or state.

Dr. McCleary specifically responded to Dr. Linz's criticisms of the studies conducted in Austin and Minneapolis. Dr. McCleary testified that although it is true that the Austin study only looked at six of the forty-nine sexually oriented businesses in the city, the results of the study remain valid and find substantial and statistically significant secondary effects associated with the businesses. Dr. McCleary explained that all researchers eliminate sites that would contaminate a study. In the Austin study a large number of businesses were eliminated because they were all located within the University of Texas at Austin campus. Dr. McCleary explained that university campuses are crime hot spots, and the researchers would not have been able to clearly attribute the crimes in those areas to the sexually oriented businesses. However, Dr. McCleary testified that because university campuses are generally crime hot spots, if those sites had not been eliminated the evidence of secondary effects would likely have been even larger. He concluded that the Austin study was a good study that found substantial evidence of secondary effects connected to sexually oriented businesses.

35

Dr. McCleary also criticized Dr. Linz's attacks on the Minneapolis, Minnesota study. Dr. McCleary said that the researchers found very significant and substantial evidence of secondary effects related to sexually oriented businesses. He noted that many features of the study design would typically favor a finding of no secondary effects. Dr. McCleary postulated that Dr. Linz did not fully understand the extremely technical path analysis study because, to his knowledge, Dr. Linz has never conducted a path analysis. Dr. McCleary concluded that in no way did the researchers ever repudiate their findings and that the results of the Minneapolis study revealed substantial evidence of secondary effects.

Moreover, Dr. McCleary attacked the validity and reliability of Dr. Linz's three studies – Charlotte, Fort Wayne, and Greensboro. Dr. McCleary criticized Dr. Linz's use of Calls for Service ("CFS") in the Charlotte study instead of Uniform Crime Reports ("UCRs") as an indicator of crime incidents. He also stated that CFS include too many false alarms, include too many duplicate calls for the same incident, and leave out many crimes that are discovered by patrolling or means other than a 911 call to the police. Dr. McCleary advanced the opinion that UCRs are the preferred way to calculate actual incidents of crime. He stated that he had conducted a statistical power analysis of the Charlotte study and that this analysis revealed that the study failed to yield the conventional power level required in the social sciences for a reliable study. He testified that a statistical power rating of 80% or higher or a false negative rate of 20% or less is acceptable. The statistical

36

power measures the likelihood that an effect would be found if there was one. Dr. McCleary testified it is necessary to know the statistical power of a study because it is very easy to design a study, on purpose or by accident, that does not find any secondary effects. Therefore, a finding of no secondary effects is only useful if the likelihood that the particular method used in the study would find an effect if one actually did exist is 80% or higher. He stated that the low power rating of the Charlotte study was likely a result of using only three controls, which was not enough to alleviate the background noise of other variables. Dr. McCleary explained that although Dr. Linz did not find any effect on crime rates associated with sexually oriented businesses in Charlotte, the power level indicates that the methodology used in Charlotte, specifically using only three controls, was unlikely to find an effect even if one did exist.

Next, Dr. McCleary criticized Dr. Linz's Fort Wayne study for considering 1000 foot study areas around sexually oriented businesses. Dr. McCleary stated that such a large area dilutes the effects the adult business has on crime in the smaller area surrounding the business; he testified that 500 foot study areas are the more accepted area to use when studying secondary effects of a business. Although Dr. Linz used UCRs in this study, Dr. McCleary criticized him for using only an artificial subset of UCRs because Dr. Linz only included the UCRs that resulted in an arrest. Dr. McCleary testified that this is just one of many artificial subsets of UCRs that can be used and it prevents comparing a study's results to

37

other studies that normally use all UCRs as their measure of crime. He also criticized the Fort Wayne study for failing to report the actual data used in the study. Because the data is not reported, other researchers cannot replicate the study.

Dr. McCleary also critiqued Dr. Linz's Greensboro study that used regression analysis. Dr. McCleary testified that when he used a different method of analysis to study the same data Dr. Linz used in his Greensboro study, he found statistically significant higher crime rates surrounding sexually oriented businesses. He said that using regression analysis as Dr. Linz did is not reliable because Greensboro is too small a city for that method and thus Dr. Linz's results are not valid. Dr. McCleary testified that to make the findings of a regression analysis significant he would need 2000 census blocks. Because Greensboro is not that large, Dr. McCleary testified that even if sexually oriented businesses created large, significant secondary effects, which he testified the data did illustrate, the regression method would still not be able to detect the effects. He also again criticized Dr. Linz's measurement of crime using CFS instead of UCRs in Greensboro.

In addition to using a regression technique in Greensboro, Dr. Linz also performed two before and after studies looking at the effects of crime before and after a sexually oriented business opened and also before and after a different sexually oriented business closed. Dr. McCleary testified that the four month time

38

period used by Dr. Linz was too short a period to properly analyze any effects. Furthermore, Dr. McCleary stated that using CFS over a four month period is troublesome because studies show that CFS vary according to the time of year. For example, during the Christmas holidays or during the summer months, Dr. McCleary testified that CFS always spike independent of the study location. Therefore, in addition to the normal problems associated with using CFS, Dr. McCleary testified that analyzing CFS over short time periods creates even more background noise in determining the number of actual criminal incidents.

After critiquing the studies individually, Dr. McCleary testified that his biggest criticism of Dr. Linz's studies is his use of too many methods. He criticized Dr. Linz for using different measurements of crime, different methods of choosing control areas, and different statistical analyses. Dr. McCleary stated that by constantly changing the methods of his analysis Dr. Linz failed to see if the results were consistent in different locations. While implying on direct examination that Dr. Linz was "fishing" for a certain result by changing his methods in different cities, on cross examination Dr. McCleary testified that he was simply questioning the statistical significance of Dr. Linz's findings and did not believe that Dr. Linz chose different methods of analysis to fish for a certain result.

In addition to criticizing Dr. Linz's studies that found no relationship between the location of sexually oriented businesses and secondary effects, Dr. McCleary testified about studies that support his opinion that sexually oriented businesses

39

create negative secondary effects in the areas surrounding the businesses. He testified about some of the studies that are included in the Comus Summaries[10] to state his opinions on the usefulness of each study as well as about additional studies that he has conducted. Furthermore, he testified that in his opinion there have been at least ten well-researched, reliable empirical studies that have found evidence that sexually oriented businesses produce secondary effects. In addition to the Austin, Texas and Minneapolis, Minnesota studies discussed supra, Dr. McCleary also testified that studies conducted in Whittier, California and Newport News, Virginia were well-researched studies that also found evidence that sexually oriented businesses produce secondary effects.

Furthermore, Dr. McCleary testified about studies he personally was involved in conducting in Garden Grove, California; Centralia, Washington; and Harvey, Illinois, all of which found evidence that sexually oriented businesses produce secondary effects. Dr. McCleary testified that his Garden Grove study is one of the best researched studies that has found evidence of sexually oriented businesses producing secondary effects. In Garden Grove, before and after studies were conducted on sexually oriented businesses that "expanded"[11] to see if crime

---

[10] Noticeably absent from Dr. McCleary's testimony about other secondary effects studies are the Phoenix, Arizona, study and the Los Angeles, California, study, both of which were specifically cited in the preamble to § 18B-1005.1 and both of which Dr. Linz criticized extensively.

[11] The term expansion was defined in this study to include the opening of a separate adult business next door as well as an existing adult business that

rates changed after the expansion.  Dr. McCleary used UCRs to measure the crime incidents in the area around the business before and after expansion.  Although on cross examination he admitted the data on vice crimes was not conclusive, [12] Dr. McCleary maintained that his studies showed strong evidence of a relationship between sexually oriented businesses and crimes against property (i.e. burglary, theft, and robbery) and crimes against persons (i.e. assault, homicide, and rape).

At the close of all the evidence in this case, the Court is left with conflicting testimony from multiple experts.  Alameda Books does not require this Court to substitute its judgment in regards to whether § 18B-1005.1 will reduce secondary effects of sexually oriented businesses, so long as the entire evidentiary record could fairly support the General Assembly's belief that sexually oriented businesses create secondary effects.  It is not realistic to expect members of the General Assembly to read every study produced about secondary effects and adult businesses.  Reading summaries that by necessity do not include all of the details of every study does not make the evidence useless to the General Assembly.

expanded into new services.

[12] Vice crimes are "victimless" crimes such as prostitution and drugs.  Dr. McCleary testified that these crimes are notoriously hard to study because they are extremely sensitive to the amount of police patrolling the area.  According to Dr. McCleary crimes such as burglaries and assaults are not reported more frequently with increased police patrols, but vice crimes are reported much more frequently when the police are actively patrolling and looking for vice crimes.  Therefore, he cautioned that reliable data regarding incidents of vice crimes is extremely difficult and probably impossible to ascertain.

Although Dr. Linz's testimony did "cast direct doubt" on the validity of the Comus Summaries, Dr. McCleary's testimony tended to rehabilitate their usefulness so that a reasonable legislator could find that the Summaries offer some evidence of a relationship between sexually oriented businesses and secondary effects.

The Defendants did not call any witnesses to rebut the testimony of Dr. McLaughlin that sexually oriented businesses do not negatively effect property values or produce urban instability in the areas immediately surrounding the businesses. Dr. McCleary testified about some surveys conducted in studies including Garden Grove which reflected an opinion among real estate professionals that sexually oriented businesses negatively impact property values and create urban instability. However, Dr. McCleary candidly admitted that the response rate of the real estate professionals surveyed was so low that the results of the surveys cannot be considered scientifically reliable.

Again, it is not the function of this Court to decide which experts are more likely than not correct about whether adult businesses create secondary effects. [13] The question is whether, based upon all the evidence presented at trial, the General

---

[13] Plaintiffs argued in their closing at trial that this case is analogous to Peek-a-Boo Lounge, 337 F.3d at 1251. However, Peek-a-Boo Lounge was before the Eleventh Circuit on a motion for summary judgment. At that point the court stated, "We are not dealing, therefore, with a case involving a battle of competing experts." Id. This case does deal with a battle of competing experts, and if all of the testimony were before the General Assembly it could reasonably find that the evidence fairly supports a relationship between sexually oriented businesses and secondary effects.

42

Assembly would have a substantial basis of fact from which it could reasonably believe that sexually oriented businesses create negative secondary effects. Although the evidence does not provide a substantial basis of fact to support an inference that sexually oriented businesses negatively impact property values or create urban instability, the evidence was sufficient for the General Assembly to believe that sexually oriented businesses are associated with higher incidents of crime.

Therefore, using the Alameda Books framework, the Defendants have established that the State has a substantial interest in decreasing incidents of crimes associated with sexually oriented businesses that are licensed by the Commission.

C.

The third O'Brien prong requires that the statute can be "justified without reference to the content of the regulated expression." Barnes, 501 U.S. at 567. In the preamble to § 18B-1005.1 the North Carolina General Assembly stated,

> [I]t is not the intent of the General Assembly to suppress the conduct of entertainment at premises licensed by [the Commission], but it is the desire of the General Assembly to address the harmful secondary effects of such entertainment, including higher crime rates, public sexual conduct, sexual assault, prostitution, and other secondary negative effects.

2003 N.C. Sess. Laws 382. Also, in the preamble the General Assembly explained that in creating this statute it reviewed studies, conducted in locations across the United States, of the secondary effects of sexually oriented businesses.

43

Id. Even without such a preamble stating the General Assembly's intention, the
Fourth Circuit relied on the long-established purposes of alcohol control laws to find
that one purpose of § 18B-1005, the predecessor to § 18B-1005.1, was "to
address the secondary effects that follow from lewd conduct on licensed
premises." Giovanni, 303 F.3d at 515. The preamble to § 18B-1005.1 combined
with the Fourth Circuit's previous decision requires the finding that North Carolina's
interest in enacting §18B-1005.1 is unrelated to the suppression of free expression
because it can be justified by an intent to reduce the secondary effects of sexual
conduct at premises licensed to dispense alcohol.

D.

Once a substantial interest is found that is unrelated to the suppression of
free speech, the fourth prong of O'Brien requires that "any incidental restriction on
alleged First Amendment freedoms be no greater than is essential to further the
government's interest." 391 U.S. at 376. This prong is often referred to as the
requirement for "narrow tailoring." Rock Against Racism, 491 U.S. at 799.
Although the government is not required to choose the "least intrusive means," the
statute must not "burden substantially more speech than is necessary to further
the government's legitimate interests." Id. In other words, the "[g]overnment may
not regulate expression in such a manner that a substantial portion of the burden
on speech does not serve to advance its goals." Id.

Section 18B-1005.1 (a)(1), furthers North Carolina's substantial interest in

44

decreasing the negative secondary effects from the combination of adult entertainment, nude dancing, and alcohol because it prohibits nude "conduct and entertainment" in ABC-licensed establishments. Sections 18B-1005.1 (a)(2) & (3) go further, however, and also prohibit any permittee or employee of a permittee from engaging in certain erotic movements, regardless of whether the dancer is nude. These movements include for example, "[a]ny conduct or entertainment that includes or <u>simulates</u> sexual intercourse...any act that <u>simulates</u> penetration, however slight...," and "[a]ny conduct or entertainment that includes the fondling of the breasts, buttocks, anus, vulva, or genitals." § 18B-1005.1 (a)(2) & (3). In other words, many types of dancing which would include that commonly referred to as "erotic" dancing. The restrictions on nudity found in subsection (a)(1) are completely separate from the restrictions found in subsections (a)(2) & (3). Thus, any dancing which incorporates moves "simulating" any of the specified acts or any "fondling" of specified areas of the body would be prohibited at an ABC-licensed establishment even if the dancers are fully clothed.

By prohibiting erotic movements and gestures regardless of the amount of clothing worn, § 18B-1005.1 is much broader than other statutes previously upheld as permissible to combat the secondary effects associated with sexually oriented businesses. Although the Supreme Court has recognized that nude dancing is expressive conduct within the outer parameters of First Amendment protection, it has also upheld public nudity statutes that required erotic dancers to

45

wear a minimal amount of clothing.  The Court has approved of statutes requiring

pasties and a G-string while performing, stating that such restrictions have a "*de*

*minimis*" effect on the expressive component of erotic dancing and "leave[] ample

capacity to convey the dancer's erotic message."  Pap's A.M., 529 U.S. at 301;

see also Barnes, 501 U.S. at 571 ("[T]he requirement that the dancers don pasties

and G-strings does not deprive the dance of whatever erotic message it conveys; it

simply makes the message slightly less graphic.").  Section 18B-1005.1 (a)(1) is in

line with these permitted restrictions on nude dancing.  Sections 18B-1005.1 (a)(2)

& (3), however, impact expressive dancing more extensively than those statutes

discussed in Pap's A.M. and Barnes because they do not require that a dancer be

nude or semi-nude to be in violation of the statute.  Rather these two subsections

discuss the type of movements and gestures made, entirely separate from the

prohibition on nudity contained in § 18B-1005.1 (a)(1).  In fact, the dancers at

Christie's Cabaret and Pure Gold could be completely clothed and their

performances would likely still be in violation of subsections (a)(2) & (3).  The

uncontradicted and unimpeached testimony of Dr. Judith Hanna[14] was that

---

[14]Dr. Judith Hanna is an anthropologist, who specializes in the nonverbal
communication of dance.  Dr. Hanna holds a Ph. D. in anthropology from Columbia
University and has published various books including To Dance is Human, A Theory
of Nonverbal Communication, The Performer-Audience Connection: Emotion to
Metaphor in Dance and Society, Dance, Sex, and Gender: Signs of Identity,
Dominance, Defiance and Desire, Dance and Stress, and Partnering Dance and
Education, Intelligent Moves for Changing Times. Furthermore, she has published
approximately 100 articles in peer-reviewed journals, and has conducted original
research on the topic of dance in Africa, American schools and theaters, and 86

46

movements in dance such as those with the hips, thighs, breasts, hair, and hands have traditionally been associated with simulating sex. A dancer's inability to move those body parts in a suggestive way would end erotic dancing. Thus, this statute results in more than the *de minimis* effect of pasties and a G-string on the expressive nature of the erotic dancing and instead effectively prohibits the actual dancing, unrelated to the amount of clothing worn by the performer.

Several courts faced with statutes similar to § 18B-1005.1 have suggested that this type of prohibition may be too burdensome on the expressive elements of erotic dancing. For example, in <u>Peek-a-Boo Lounge</u> the Eleventh Circuit, addressing an anti-nudity ordinance that defined nudity as "covering less than one-third of the buttocks or one-fourth of the female breast," suggested that "because erotic dancers...are *not* '[f]ree to perform wearing pasties and G-strings,' arguably, the County's prohibition could significantly impact [the erotic] message." 337 F.3d at 1274 (emphasis in original) (remanding for further consideration of whether the ordinance fails under intermediate scrutiny because it proscribes too much protected expression); <u>see also</u> <u>Ranch House, Inc. v. Amerson</u>, 238 F.3d 1273, 1285-86 (11th Cir. 2001) (remanding under similar circumstances and providing guidance to the District Court regarding the application of <u>O'Brien's</u> narrowly tailoring prong). Similarly, in <u>R.V.S., L.L.C. v. City of Rockford</u>, the Seventh Circuit struck down an ordinance that required all persons performing erotic dance to wear

---

exotic dance clubs within the United States.

47

the "equivalent of short shorts and, if female, an opaque bra," because it was not narrowly tailored to affect a category of business establishments shown to produce, or that could conceivably produce, the unwanted secondary effects.  361 F.3d 402, 413 (7th Cir. 2004).  The court noted that the Ordinance, "deprives the performer of a repertoire of expressive elements with which to craft an erotic sensual performance and thereby interferes substantially with the dancer's ability to communicate an erotic message."  Id. (citing Schultz v. City of Cumberland, 228 F.3d 831, 847 (7th Cir. 2000) (invalidating regulation that banned the performance of specified sexually explicit movements within sexually oriented businesses finding that "[b]y restricting particular erotic movements and gestures of the erotic dancer … [the regulation] unconstitutionally burdens protected expression")).  Subsections 18B-1005.1 (a)(2) & (3) are remarkably similar to the broad statutes and ordinances found questionable in these cases.

In order to justify a substantial burden on protected speech, the government must show that the restriction is necessary to further its legitimate interest. However, North Carolina has presented no evidence to support or justify such a substantial burden on the expression of speech contained in erotic dancing.  In order to meet the narrow tailoring requirement, some evidence must be presented that is *specific* to the activity or business being regulated.  Alameda Books, 535 U.S. at 438 ("The municipality's evidence must fairly support the municipality's rationale for its ordinance.") (emphasis added).  The Defendants here fail to present

48

any evidence that justifies such a broad restriction on the expression of non-nude erotic dance as that contained in § 18B-1005.1(a)(2) & (3).[15]  For example, there was no evidence that adverse secondary effects might result from fully clothed dancers performing erotic dance which incorporated some or all of the prohibited simulations.

During trial the Defendants cited a substantial interest in decreasing incidents of crimes associated with sexually oriented businesses that are licensed by the Commission to sell alcohol. The evidence presented concerned the negative secondary effects associated with such activities at adult entertainment establishments, primarily those with nude or semi-nude dancing.  The statute in question, however, covers much more than just sexually oriented businesses and far more than just the nude or semi-nude dancing often found in such establishments.   Section 18B-1005.1 prohibits "[a]ny conduct or entertainment that includes or simulates sexual intercourse...," and additional conduct otherwise referred to as erotic dancing, without reference to the amount of clothing involved. Evidence of secondary effects specific to these prohibited activities is required to

---

[15] Although the restriction here is not a complete ban on exotic dancing, but rather prohibits the service of alcoholic beverages in covered establishments, alcohol prohibition statutes still must be narrowly tailored to match the substantial interest cited by the government. Cf. Ben's Bar, 316 F.3d at 727-28 (discussing that the relevant alcohol prohibition is limited to adult entertainment establishments and noting the prohibition is the *only* way the government could advance its interest in combating the secondary effects resulting from the combination of nude and semi-nude dancing and alcohol consumption).

49

meet the narrow tailoring requirement.  <u>Alameda Books</u>, 535 U.S. at 438.  As stated, the Defendants have presented no such evidence.

A similar situation was present in <u>Encore Videos, Inc. v. City of San Antonio</u>, where the city of San Antonio enacted a zoning ordinance that covered both sexually oriented businesses and any bookstore, novelty store, or video store that devoted over 20% of its inventory or floor space to sexually explicit materials. 330 F.3d 288, 295 (5th Cir. 2003).  The Fifth Circuit struck down the ordinance because San Antonio failed to provide substantial evidence related to the secondary effects "specific to adult businesses that sell books or videos solely for off-site entertainment."  <u>Id.</u>  The studies relied upon by the General Assembly in enacting this ordinance were all focused on the secondary effects associated with nude or semi-nude dancing or adult entertainment.  The Defendants failed to provide specific evidence of how these secondary effects related to the combination of clothed or non-nude erotic dancing and alcohol.  Such evidence is necessary to determine whether a content-neutral restriction on speech passes intermediate scrutiny under <u>O'Brien</u>.  <u>See e.g.</u> <u>R.V.S.</u>, 361 F.3d at 413 ("Simply, [the government] has not presented justification why it is essential to regulate such a wide universe of dance."); <u>Pleasureland Museum, Inc. v. Beutter</u>, 288 F.3d 988, 1002 (7th Cir. 2002) (holding that an ordinance prohibiting the content of signs on sexually-oriented businesses be limited to the legal name of the enterprise was not narrowly tailored because "such a drastic restriction on signage cannot be

50

sustained without some sort of evidentiary support").

Although the Defendants provided evidence sufficient to state a legitimate interest in regulating the type of nude or semi-nude dancing often found in adult establishments, they failed to provide evidence of any secondary effects related to the combination of fully or partially clothed erotic dancing and alcohol.[16] Without evidence of a legitimate interest in restricting such activities, sub-sections (a)(2) & (3) of the statute burden substantially more speech than is necessary to further the interests of the state. Thus, § 18B-1005.1(a)(2) & (3) fail to satisfy the fourth prong of the O'Brien test.[17]

IV.

Plaintiffs also assert that § 18B-1005.1(a)(2) & (3) are unconstitutionally overbroad on their face. According to the facial overbreadth doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may

_____

[16] If such effects were noted, the statute would likely result in many non-adult establishments - including most bars and night clubs that allow dancing - to be denied an ABC-license as well.

[17] This analysis would be unchanged if the statute were viewed as a time, place and manner restriction under Renton. In Renton the Court upheld the ordinance because it was "narrowly tailored to affect only the category of theaters shown to produce the unwanted secondary effects...." 475 U.S. at 52. Under both the Renton and O'Brien analyses, § 18B-1005.1, is not narrowly tailored to further the substantial interest advanced by the state of North Carolina.

51

refrain from doing so rather than risk prosecution.'" <u>Board of Airport Comm'rs v.</u> <u>Jews for Jesus, Inc.</u>, 482 U.S. 569, 574 (1987) (quoting <u>Brockett v. Spokane</u> <u>Arcades, Inc.</u>, 472 U.S. 491 (1985)).  The overbreadth doctrine is related to the vagueness doctrine, discussed <u>infra</u>, yet they involve two distinct tests. "Overbroad legislation need not be vague, indeed it may be too clear; its constitutional infirmity is that it sweeps protected activity within its proscription." <u>M.S. News Co. v. Casado</u>, 721 F.2d 1281, 1287 (10th Cir. 1983).  If an overbreadth challenge succeeds, any enforcement of the statute at issue is "totally forbidden." <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613 (1973).  However, application of the overbreadth doctrine is "strong medicine" and courts should use the doctrine "sparingly and only as a last resort." <u>Id.</u>  Thus, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." <u>New York v. Ferber</u>, 458 U.S. 747, 771 (1982).  Further, when the statute regulates conduct and not merely speech, Plaintiffs must establish that the overbreadth is "not only . . . real, but substantial as well, judged in relation to the statute's plainly legitimate sweep," and also that no "limiting construction" or "partial invalidation" could "remove the seeming threat or deterrence to constitutionally protected expression." <u>Broadrick</u>, 413 U.S. at 615.

Both this Court and the Fourth Circuit Court of Appeals found former N.C. Gen. Stat. § 18-1005 and its accompanying administrative Rule, N.C. Admin. Code tit. 4, r. 2S.0216 (2000), to be unconstitutionally overbroad in violation of the First

52

and Fourteenth Amendments because it reached a substantial amount of constitutionally protected expression. <u>Giovani</u>, 303 F.3d at 520; <u>Giovani</u>, 147 F. Supp. 2d at 395.

The Defendants offer a chart pointing out the changes in language from the former statute § 18B-1005 and its accompanying Rule to the revised statute, § 18B-1005.1, in support of their argument that the new statute is less broad than the older version. (Mem. in Supp. Of Resp. to Mot. for Prelim. Inj. 6-7.)  The conduct prohibited by § 18B-1005.1, however, is substantially the same as the conduct prohibited by former § 18B-1005 and its accompanying Rule.  For example, the new statute prohibits exposing "genitals," whereas the original statute prohibited exposing "private parts."  This change in terminology does not affect the statute's scope because both terms refer to the same thing.

Additionally, the original statute prohibited conduct that includes simulating sexual intercourse or "any other sexual act," and then provided a list of specific prohibited acts in the accompanying Rule.  The current statute lists these acts in the text of the statute and therefore prohibits any conduct or entertainment – even by a person who is fully clothed – which simulates "sexual intercourse," "masturbation," "oral copulation," "flagellation," or any act that "simulates the penetration, however slight, by any object into the genital or anal opening of a person's body."  Although the specific identification of sexual acts within the statute tightens the language, the inclusion of "simulate[d] sexual intercourse"

53

remains.  The specific conduct amounting to "simulate[d] sexual intercourse,"

however, is not defined.  That this term remains undefined is problematic because

a loose construction of terms creates overbreadth problems.  <u>Giovani</u>, 147 F. Supp.

2d at 392.  For example, in her testimony, Dr. Hanna, testified that every form of

dance incorporates movements that can be seen as suggesting sex: ballet, hiphop,

belly dancing, flamenco, and jazz.  Even the Irish Step Dance which involves a rigid

upper body and a leg pounding upon the ground can be associated with the

"phallus pounding [sic] the female."  Dr. Hanna's testimony was credible and

uncontradicted.

Finally, the original Rule prevented "touching, caressing, or fondling of the

breasts, buttocks, anus, vulva, or genitals," whereas the current statute prohibits

"fondling of the breasts, buttocks, anus, vulva, or genitals."  The elimination of the

words "touching" and "caressing" does not cure the overbreadth.  Limiting the

actions prohibited to "fondl[ing]" does not change the meaning of the statute at all

because, by definition, fondling includes caressing and touching.  <u>See</u> <u>Webster's</u>

<u>New Universal Unabridged Dictionary</u>, 315, 745 (1996) (defining fondle as "to

handle or touch lovingly, affectionately, or tenderly; caress" and caress as "to

touch or pat gently to show affection; to touch, stroke, etc. lightly").  Dr. Hanna

testified that a performer cannot convey the erotic message of exotic dance

without the ability to touch her buttocks and breasts.  She also testified that

touching those body parts is common in flamenco, belly dances, and jazz.

54

Under the new statute, any time the owner of a non-exempt ABC-licensed premises allows a person, even a fully clothed person, "to have the appearance or characteristics of" having sexual intercourse, the owner is in violation. In addition, no one on the premises could "handle or touch lovingly" a fully clothed breast or buttock. The breadth of this statute would even reach the owners of Bank of America Stadium who permit the Carolina Panther cheerleaders, the Topcats, to perform dances incorporating movements that, even momentarily, could be interpreted as "simulat[ing] sexual intercourse." When their cheers involved "handling or touching in a loving way" their own buttocks, they would be in violation of the statute. Coliseums or arenas that book popular acts like Britney Spears or Madonna could be in violation based on the dance movements of the performers and their backup dancers. Further, the statute prevents even nonemployees from engaging in the prohibited conduct so long as the owner or its agent knows of the conduct. Thus, every bar or dance establishment in the state that allows people to dance to popular music would likely be in violation because, as Dr. Hanna testified, dance movements are strongly related to sexual movements. Although the prohibitions would reach many types of dancing,[18] the types of bump and grind movements associated with hip hop music provide the

---

[18] Dr. Hanna testified that ballet, modern, jazz, hip hop, salsa, flamenco, and belly dance all include body movements that can be regarded as simulating sexual acts. Further, Dr. Hanna testified that the dance movements involving self-touch are common in belly dance, flamenco, and jazz in addition to exotic dancing.

clearest examples of dance movements that "have the appearance or characteristics of" sexual intercourse. The prohibitions would likewise apply to fully clothed customers wishing to do the shag or other popular dances such as those seen on the TV show *Soul Train* or the movies *Dirty Dancing* or *Saturday Night Fever*. It would apply to disco or the Tango, or any other dances that involve the swinging of a leg or thrusting of a hip or any other movement that might be interpreted as simulating sexual intercourse. Thus, the statute's effects on protected expression remain very broad.

Defendants offer no support of any material changes to the statute other than the chart pointing out the changes in language which, in application, are insignificant. (Mem. in Supp. Of Resp. to Mot. for Prelim. Inj. 6-7.) Because the language of the conduct prohibitions in § 18B-1005.1(a)(2) & (3) is substantially similar to the language previously found unconstitutional, the coverage of the restrictions has not changed, and the Fourth Circuit's findings on the former statute still apply:

> The restrictions challenged here, however, sweep far beyond bars and nude dancing establishments. They reach a great deal of expression in the "heartland of [the First Amendment's] protection." As the Commission has conceded, the plain language of the restrictions prohibits on licensed premises any entertainment that "simulates" sexual behavior, even if performers are fully clothed or covered, and even if the conduct is integral to the production . . . . The Commission has further conceded that the restrictions have the same prohibitory effect on much nonerotic dance – such as a ballet in which one dancer touches another's buttock during a lift . . . and most kinds of jazz and flamenco dance."

56

<u>Giovani</u>, 303 F.3d at 516 (internal citations omitted).

The new statute, § 18B-1005.1, however, does carve out an exception which was not in the original statute. Specifically, the statute states, "This section does not apply to persons operating theaters, concert halls, art centers, museums, or similar establishments that are primarily devoted to the arts or theatrical performances, <u>when</u> the performances that are presented are expressing matters of serious literary, artistic, scientific, or political value." N.C. Gen. Stat. § 18B-1005.1(c) (emphasis added). This statutory exception is clearly an attempt by the General Assembly to follow the Fourth Circuit's earlier opinion where it pointed out that options existed for narrowing the broad language of the statute and regulation. Specifically the Fourth Circuit stated that:

> [O]ther jurisdictions with similar concerns have adopted narrower regulations, targeting only those venues where secondary effects are likely to arise, while leaving other speech unaffected. <u>See, e.g.</u>, <u>Farkas v. Miller</u>, 151 F.3d 900, 901-03, 905 (8th Cir. 1998) (upholding a statute making it a misdemeanor to permit nudity or certain actual or simulated sex acts at a "place of business required to obtain a sales tax permit" because the statute exempted any "theater, concert hall, art center, museum, or similar establishment which is primarily devoted to the arts or theatrical performances" (citation omitted)); <u>see</u> <u>also</u> <u>J&B Entm't</u>, 152 F.3d [362], 376-77 [(5th Cir. 1998)] (upholding zoning ordinance that punished certain forms of nude entertainment because the ordinance contained an exemption for persons "engaged in expressing a matter of serious literary, artistic, scientific or political value"). North Carolina could have adopted restrictions containing exemptions like those in <u>Farkas</u> and <u>J&B</u>, and if it had done so, this case might well yield a different result.

<u>Giovani</u>, 303 F.3d at 517-18. Thus, the Fourth Circuit rejected the Defendants'

argument that the statute was the "only means to protect its interest" and provided examples of what other states have done. After providing these examples of alternative construction, the Fourth Circuit said they "might" create a different result, but did not discuss this issue further. Because the General Assembly chose to model the language of their added exception on that in <u>Farkas</u> and <u>J&B</u>, an analysis of whether this exception cures the statute's overbreadth is now in order.

While the statute and its exception under consideration in <u>Farkas</u> are quite similar to the amended North Carolina statute, the primary issue under consideration was quite different. Specifically, <u>Farkas</u> involved the anti-nudity provision of the Iowa statute and the question whether totally nude dancing could be prohibited in every venue charging sales tax. This case does not involve only the anti-nudity provision of the North Carolina statute. The application of the exception in <u>Farkas</u> – limiting totally nude performances to what has traditionally been referred to as legitimate theater – is quite different from limiting non-verbal conduct by fully clothed persons to that setting.

In its brief discussion of contentions relating to overbreadth and vagueness, the <u>Farkas</u> court did not discuss what, if any, evidence had been presented to the district court regarding the effect a prohibition of body language interpretable as "simulating" a sex act could have upon dance – either erotic dancing or the types of popular dancing engaged in by fully clothed patrons of non-adult entertainment

58

establishments. Nor did the court engage in an analysis of whether substantial, mainstream activities such as plays, dance performances, comedy routines, or political satire might be impacted when occurring at venues not primarily devoted to the arts.

In J&B, the ordinance in question did not prohibit the "simulated" sexual conduct or movements being questioned here but expressly prohibited public nudity, public sexual intercourse, and the public fondling of one's genitals.[19] The limitation of that activity to "legitimate" theater is again different from the question presented in this case.

The exception adopted in § 18B-1005.1 does not exclude coliseums, hotels, athletic stadiums, non-adult entertainment dancing facilities, convention centers, taverns, bars, comedy clubs or restaurants – many of which will either forego traditionally acceptable and previously lawful activity involving expressive performances, no matter how artistic or serious their value, or face sanctions for violating the statute. Instead of limiting the statute's application to the small number of ABC-licensed businesses that regularly feature "adult entertainment," the exception merely carves out an equally small percentage of permit holders from the law's coverage. No venue which is not "primarily devoted to the arts or theatrical performances" would be exempt, even when featuring a performance

---

[19] The ordinance in J&B excepted any "person engaged in expressing a matter of serious literary, artistic, scientific or political value." 152 F.3d at 365.

59

"expressing matters of serious literary, artistic, scientific, or political value." That would include plays, concerts, non-adult entertainment dance performances – both amateur and professional – and political satire, even when all performers are fully clothed. As observed earlier, it would also apply to traditional dance clubs and nightclubs where fully clothed patrons wish to engage in dances from hip hop to salsa, from the shag to other popular dances such as those seen on television's *Soul Train* or in *Dirty Dancing* or *Saturday Night Fever*.

It would also apply to fully clothed comedians engaging in sexually explicit humor if any part of the routine involved, even briefly, a move that could be interpreted as simulating sexual intercourse or masturbation or any other prohibited act. For example, "the bird" and "the ram" have origins as simulated penetration. A comedian extending and patting his rear end as in an invitation that a particular politician "kiss this" could be committing a prohibited act if the pat lingers. A comedian thrusting his hips at the audience to symbolize the effect that a particular politician's actions have had upon the public would commit a prohibited act.

This case would present a different question if the statute could be construed in a manner that narrowed its scope of application. <u>Giovani</u>, 303 F.3d at 517. However, a limiting construction may not be adopted unless the provision(s) is "readily susceptible to such an interpretation by state courts; a federal court cannot rewrite state law by itself." <u>Id.</u> The Defendants asserted during closing argument that "simulated sexual intercourse" could be interpreted to require

60

simulated penetration.  However, the Commission cites no prior state case for this proposition and such a claim flies in the face of the statutory language which prohibits both simulated sexual intercourse and simulated penetration.  Rules of statutory construction require the Court to assume that each word of a statute has independent meaning.  The language of this statute cannot be interpreted to avoid burdening a substantial amount of mainstream musical, theatrical, and dance activity as demonstrated supra, and the General Assembly could easily have drafted a statute that is less invasive of free speech interests.

Because the breadth of § 18B-1005.1(a)(2) and (a)(3) reach a substantial amount of protected conduct, it is determined that those provisions in the statute are unconstitutionally overbroad on their face.

V.

Plaintiffs next assert that the statute is unconstitutionally vague.  A statute can be found impermissibly vague for either of two independent reasons.  Hill v. Colorado, 530 U.S. 703, 732 (2000).  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Id. Second, if it permits or even encourages arbitrary and discriminatory enforcement because it fails to provide adequate standards for enforcement.  Id.  However, these concerns must also balance with the recognition that because we are "condemned to the use of words, we can never expect mathematical certainty from our language."  Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).  The

61

Supreme Court cautions that courts should uphold prohibitions even if they "may not satisfy those intent on finding fault at any cost, [but] are set out in terms that the ordinary person exercising common sense can sufficiently understand and comply with." Broadrick, 413 U.S. at 608.

In affirming the earlier preliminary injunction in this case due to overbreadth, the Fourth Circuit found it unnecessary to rule on the merits of the Plaintiffs' vagueness challenge. Giovani, 303 F.3d at 520. However, this Court's previous opinion found that the original statute suffered from "undefined, vague restrictions" that fail to allow people of ordinary understanding to know what conduct is prohibited. Giovani, 147 F. Supp. 2d at 392. The vagueness problems of the original statute have not been addressed. The new statute continues to prevent simulated sexual intercourse, simulated masturbation, simulated oral copulation, and simulated flagellation. In addition, the statute prevents "fondling" the breasts, buttocks, anus, vulva, or genitals. The words "simulated" and "fondling" in § 18B-1005.1 are unconstitutionally vague because they do not provide people of ordinary intelligence a reasonable opportunity to understand its coverage. Additionally, they permit arbitrary and discriminatory enforcement because they fail to provide adequate standards for enforcement.

The terms of the statute are such that persons of common intelligence would be unsure of the statute's meaning and application and are thus unconstitutionally vague. See United States v. Gilbert, 130 F.3d 1458, 1462

62

(11th Cir. 1997) ("Vagueness arises when a statute is so unclear as to what conduct is applicable that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'") (quoting Connally v. General Const. Co., 269 U.S. 385, 391 (1926)).  The vagueness of the terms "simulate" and "fondle" is demonstrated by simply turning to a common source, the dictionary.  Simulate is a verb meaning "to make a pretense of, feign; to assume or have the appearance or characteristics of."  Webster's New Universal Unabridged Dictionary, 1783 (1996).  Fondle is also a verb, but its exact meaning differs depending on which dictionary is consulted.  Webster's New Universal Unabridged Dictionary defines fondle "to handle or touch lovingly, affectionately, or tenderly; caress."  Id. at 745.  However, it can also mean "to treat indulgently and solicitously: pamper."  Webster's II New Riverside University Dictionary, 494 (1984), or "to handle tenderly, lovingly, or lingeringly" and "to show affection or desire by caressing." Webster's Ninth New Collegiate Dictionary, 480 (1987). Regardless of that chosen, these definitions provide little indication as to what activities are permitted under the statute.

If § 18B-1005.1(a)(2) and (a)(3) were not meant to cover the conduct defined above, the statute fails to provide any additional guidance about what conduct is prohibited.  How is a person of ordinary intelligence to know when their conduct is prohibited without further clarification?  Because this statute is not limited to sexually oriented businesses, all of the individuals that this statute covers

63

– meaning anyone in an establishment that serves alcohol that is not included in the narrow exception – must have notice of whether their conduct is a violation of the statute. The actor, the musician, the cheerleader, the comedian, and the dancer at a local night club (to mention a few) need to understand what activities are covered. Whether the insertion of one's finger into one's mouth constitutes simulated oral copulation? How many times must a clothed dancer thrust his hips in a rapid motion before it constitutes simulated sexual intercourse? How much "bumping and grinding" can two bar patrons do before an employee of the bar must stop allowing them to dance? For example, Lieutenant Brian Moize, an ABC Enforcement Agent with Greensboro Guilford ABC Law Enforcement, cited a dancer at Christie's Cabaret for simulating sexual intercourse because she was "gyrating" with her back to a customer. Can a person predict when "gyrating" one's hips changes from dancing to simulating sexual intercourse? What if they are not an erotic dancer? Additionally, at what point does touching one's own buttocks or touching another's buttocks become a violation? How long may the comedian extending and patting his derriere in the overbreadth example touch it before it becomes a fondle or caress? At what point does touching one's own breast become a violation? Is a fully clothed patron of a dance club simulating masturbation by holding a closed fist vertically in front of his body and moving it up and down? These questions are not the type of questions asked by someone "intent on finding fault at any cost" with the statute, nor do they seek

64

mathematical precision in the statute's language; these questions merely ask for some clarity of what is and is not prohibited by the statute.[20] Because the statute provides no guidance to answering these questions, the statute will likely chill constitutionally protected speech by persons seeking to comply with the statute.

The vagueness of § 18B-1005.1(a)(2) and (a)(3) also creates the likelihood of arbitrary and discriminatory enforcement of its provisions. The cheerleaders in Bank of America Stadium who "gyrate" their hips and "touch" their buttocks during a performance are making the same movements that led Lieutenant Moize to cite a dancer at Christie's Cabaret for violating the statute. Although Lieutenant Moize may not cite the manager of Bank of America Stadium, another ABC agent may, and nothing in the language of the statute prevents him from doing so. Similarly, Lieutenant Moize admitted a violation of the statute occurs anytime sexual intercourse is simulated in a licensed premises even if the persons are fully clothed and the act occurs as an important part of the plot to a serious literary performance.[21] As long as the performance is not taking place in a venue within

---

[20] But see Farkus, 151 F.3d at 905-06 (providing only cursory explanation of holding that statute was not unconstitutionally vague, stating because "[i]t will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question").

[21] Lieutenant Moize's testimony was made during a motion proceeding before the Court on February 5, 2001. Although his testimony was taken regarding the former statute, § 18B-1005 and its accompanying Rule, because the language he was referring to has not be altered substantively, it also applies to § 18B-1005.1.

65

the narrow exception of the statute, it is possible for the ABC Agent to issue a citation. The Fourth Circuit has already noted that violations could occur in a "political satire, a Shakespeare play depicting young love, or a drama depicting the horrors of rape . . . and [in] most kinds of jazz and flamenco dance." Giovani, 303 F.3d at 516. These types of performances were not the motivation behind the statute; the Preamble focuses not on the negative secondary effects of "simulated sexual intercourse" but on the negative effects of sexually oriented businesses. 2003 N.C. Sess. Laws 382. However, nothing in the language prevents an agent from deciding that this is a violation.

The vagueness of the statute would enable enforcement agents to arbitrarily enforce the statute, substituting a subjective understanding of what movement or gesture may be a violation for what should be an objective standard understandable by officer, owner, entertainer, and patron. Lieutenant Moize testified that there are no guidelines or objective criteria by which officers judge whether movements or conduct falls within the prohibitions of the statute.[22] He

---

[22] In Dodger's Bar & Grill v. Johnson County Board of County Commissioners, the Tenth Circuit Court of Appeals was faced with a similar statute that prohibited the "simulation of sexual intercourse" and the "fondling of breasts." 32 F.3d 1436, 1443-45 (10th Cir. 1994). The court rejected the plaintiff's argument that someone gyrating his hips like Elvis arguably could be simulating sex because they relied on testimony by the district attorney that Elvis' dancing was obviously not within the confines of the statute and that he did not anticipate problems enforcing the statute. Here, Lieutenant Moize's testimony did not provide such assurances, rather he testified about a great deal of protected expression that in his view would be in violation of the statute.

66

simply uses his judgment to decide if the movement of hips is sufficient to simulate

sexual intercourse, or if the handling of one's buttocks or breasts is enough to

violate the statute. Without more precise definitions of what conduct is prohibited,

enforcement officers are forced to make arbitrary decisions on what constitutes a

violation. See Kolender v. Lawson, 461 U.S. 352, 357-58 (1983) (explaining that

"the more important aspect of vagueness doctrine is…the requirement that a

legislature establish minimal guidelines to govern law enforcement"). The statute's

vague language does not provide clear standards and therefore creates a high risk

of discriminatory enforcement.

Because § 18B-1005.1(a)(2) & (3) fail to provide people of ordinary

intelligence a reasonable opportunity to understand what conduct is prohibited and

because they fail to provide adequate standards for enforcement, those provisions

of the statute are unconstitutionally vague.

VI.

For the reasons stated above, § 18B-1005.1(a)(2) & (3) are unconstitutional

as applied to the Plaintiffs. Those provisions of the statute are also

unconstitutionally overbroad and unconstitutionally vague on their face. The

enforcement of those provisions will be enjoined in an accompanying order.

This the day of October 26, 2005

＿＿/s/ N. Carlton Tilley, Jr.＿＿

67